IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of an Application to Enforce an Administrative Subpoena of the <br><br> U.S. COMMODITY FUTURES TRADING COMMISSION, <br><br> Applicant, <br><br> v. <br><br> BRYAN E. CONLEY, <br><br> Respondent. | ) ) ) ) ) ) ) ) ) Misc. Action No. ) ) ) ) ) ) ) ) |

**MEMORANDUM IN SUPPORT OF
APPLICATION FOR AN ORDER TO SHOW CAUSE AND AN ORDER
REQUIRING COMPLIANCE WITH ADMINISTRATIVE SUBPOENA**

On February 18, 2016, Applicant U.S. Commodity Futures Trading Commission ("Commission" or "CFTC"), through its Division of Enforcement (the "Division") and pursuant to its statutory authority, issued a subpoena *ad testificandum* and *duces tecum* (the "Subpoena") to Respondent Bryan E. Conley, an individual residing in Holiday, Florida, in connection with an ongoing investigation being conducted by the Division relating to certain persons engaged in fraud with respect to pooled investments and/or managed accounts of commodities. As explained below in greater detail, the Division issued the Subpoena because Mr. Conley possessed relevant information pertaining to at least one company that appeared to be fraudulently offering pooled investments in and/or managed accounts of commodities to customers and potential customers located in, among other places, the United States. Mr. Conley, however, without any valid justification, failed to comply with the Subpoena despite ample notice and warning of a potential enforcement action being filed against him in a federal

court. Instead, Mr. Conley simply noted on the Subpoena that he "d[id] not accept this offer to contract and d[id] not consent to these proceedings," signed the notation "without prejudice" pursuant to "U[niform] C[ommercial] C[ode] 1-308," and returned the Subpoena to the Division.

Accordingly, because Mr. Conley has failed to comply in any way with the obligations imposed by the Subpoena or further communicate with the Division concerning the Subpoena, and, since Mr. Conley has cited no justifiable reason for his non-compliance, the Commission's sole avenue for redress is to seek an order from the Court requiring Mr. Conley to show cause why he should not be compelled by the Court to comply fully with the Subpoena. Should Mr. Conley not show good cause, the Commission respectfully requests that the Court issue a subsequent order (1) requiring Mr. Conley to comply immediately in all respects with the Subpoena, including (a) that he produce all books, papers, documents and other tangible things specified in Schedule A to the Subpoena to the Commission that are in his possession, custody and/or control, and (b) that he personally appear before the Commission at its office in Washington, D.C., to provide testimony, as well as (2) any other relief the Court deems appropriate for Mr. Conley's failure to show good cause.

## FACTUAL BACKGROUND

The Commission is an independent federal regulatory agency responsible for administering and enforcing the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* (2012) (the "Act" or "CEA"), and Commission Regulations, 17 C.F.R. § 1.1 *et seq.* (2016) promulgated thereunder ("Regulations").

Bryan E. Conley is an individual who resides in Holiday, Florida. *See* Declaration of Commission Attorney James W. Deacon in Support of Application for an Order to Show Cause and an Order Requiring Compliance with Administrative Subpoena ("Attorney Decl.") at ¶ 8, attached here at Exhibit ("Ex") 1.

2

The Commission's mission is "to foster open, transparent, competitive, and financially sound markets, to avoid systemic risk, and to protect the market users and their funds, consumers, and the public from fraud, manipulation, and abusive practices related to derivatives and other products that are subject to the Commodity Exchange Act." COMMODITY FUTURES TRADING COMMISSION, *http://www.cftc.gov/About/MissionResponsibilities/index.htm* (last visited October 17, 2016). The markets within the Commission's jurisdiction affect "a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a) (2012). These markets—with the U.S. futures markets estimated at $30 trillion and the swaps markets at $400 trillion—are "large and economically significant," and "ensuring that these markets are transparent, open, and competitive is essential to their proper functioning and to help safeguard the financial stability of the Nation." COMMODITY FUTURES TRADING COMMISSION STRATEGIC PLAN, FYs 2014-2018, at 5, *http://www.cftc.gov/ idc/groups/public/@aboutcftc/documents/file/2018strategicplan.pdf* (last visited October 17, 2016).

To achieve its mission, one of the Commission's strategic goals is "comprehensive enforcement," carried out by the Division. *Id.* at 9, 25-29. The Division seeks to achieve this goal in part by "employ[ing] various investigative plans, analytics, and tools until sufficient evidence is obtained to determine whether or not a violation occurred within the jurisdiction of the Commission." *Id.* at 26. Chief among the Division's tools are requests for information to registrants pursuant to 7 U.S.C. § 6g (2012), voluntary requests for information and interviews of potential witnesses, and the nationwide issuance of subpoenas for documents and compelled testimony pursuant to 7 U.S.C. § 9(5)-(6) (2012). Attorney Decl. at ¶ 3.

3

In 2015, the Commission learned that Options Rider[1], through its website *www.optionsrider.com*, purportedly managed accounts for customers located in, among other places, the United States and purportedly traded binary options, such as foreign exchange traded currencies ("forex"), for its U.S. customers.[2] *Id.* at ¶ 4. Further, the Commission learned that several U.S. customers were unable to make any withdrawals from their accounts with Options Rider once they had opened their accounts. *Id.* at ¶ 5. Accordingly, on behalf of the Commission, the Division initiated an investigation into Options Rider from its Washington, D.C. headquarters to discern whether Options Rider and its principals had violated or were violating anti-fraud provisions of either the Act and/or Regulations. *Id.* at ¶ 6.

The Division has taken several steps in its investigation of Options Rider. Specifically, Division staff have, among other things, obtained authority to investigate pursuant to a formal order issued by the Commission; sent out correspondence, requested documents and issued subpoenas; received responses and documents in response to those requests, maintained investigative files; and conduced telephonic interviews with potential witnesses. *Id.* at ¶ 7.

During its investigation the Division uncovered, among other things, that Mr. Conley was associated with and/or had discreet knowledge of Options Rider, its operations, purported

---

[1] Options Rider is not a Commission registrant.

[2] A binary option is a financial option in which the payoff is either some fixed monetary amount or nothing at all. *See https://en.wikipedia.org/wiki/Binary_option* (last visited October 17, 2016). As explained by Nadex, a U.S.–based, retail–focused, online binary options exchange: "A binary option asks a simple yes/no question: Will this market be above this price at this time? You buy the option if you think yes and sell if you think the answer is no. When the trade expires, if you're right, you get the full $100 value. If you are wrong, you'll get zero." *See https://www.nadex.com/binary-options* (last visited October 17, 2016). Recently, a Court in this District held that binary options in commodities such as forex are financial instruments regulated by the Commission under the Act. *See CFTC v. Trade Exchange Network Ltd., et al.*, 117 F.Supp.3d 29, 35–38 (D.D.C. 2015); *see also CFTC v. Vision Financial Partners, et al.*, Case No 16-60297-Civ-Cohn/Seltzer, Dkt. No. 62, *Order Denying Motion to Dismiss* at 6–7 (S.D. Fla. June 3, 2016), a copy of which is attached here at Ex. 2.

principals and had provided marketing and update calls to promote Options Rider. *Id.* at ¶ 8. Specifically, the Division discovered a number of audio recordings publicly available on websites associated with Options Rider in which Mr. Conley hosted at least 51 conference calls with customers and/or potential customers of Options Rider from May 12 to November 4, 2015. *Id.* at ¶ 9. During those calls Mr. Conley, among other things, provided customers and/or potential customers with an overview of Options Rider and how it worked, introduced the purported principals of Options Rider, Bob Roberts and Michael Sloan, to customers and potential customers, and provided updates to customers concerning their investments including the status of customers' withdrawal requests. *Id.* at ¶ 10. For example, during an 18 minute call held on June 8, 2015, Mr. Conley explained to customers and potential customers:

1. "What Options Rider is and what we [Options Rider] are not";
2. That Options Rider was "a long term investment [] into a managed fund account";
3. That Option Rider "trades through the Chicago Board of Options Exchange";
4. That Options Rider trades binary options on foreign currencies against the U.S. dollar (*i.e.*, forex);
5. How trading binary options operates;
6. That Options Rider used proprietary software to trade;
7. That the software was owned by an individual named Bob Roberts;
8. That Mr. Roberts' other company, Binary Options Concierge, managed Options Rider;
9. That Mr. Roberts' software had an 80% win ratio trading binary options over the last three to four years;
10. That Options Rider "had human trader that is sitting there backing [the software] up";
11. That customers could obtain a 20% bonus on their investment for any additional customers they referred to join Options Rider;
12. The amount of minimum investment to join Options Rider;

5

13. The procedures for joining Options Rider;

14. The method for wiring funds to Options Rider; and

15. The procedures for customers to make withdrawals from their Options Rider accounts.

*Id.* at ¶ 11.

Thus, it was clear to Division staff that Mr. Conley possessed vital and direct information concerning Options Rider, its operations, and its principals. Accordingly, acting pursuant to a formal order of investigation in the matter of "Certain Persons Engaged in Fraud With Respect to Pooled Investments And/Or Managed Accounts" issued by the Commission, the Division, and, in particular, James W. Deacon, an officer of the Commission designated by the Commission to issue subpoenas pursuant to that formal order, properly issued the Subpoena to Mr. Conley on February 18, 2016 and served it on him by United Parcel Service at his residence in Holiday, Florida. *Id.* at ¶¶ 12–13 and Ex. A thereto.

The Subpoena required Mr. Conley to produce relevant documents from the period of January 1, 2013, through the present relating to not only Options Rider but also other companies that appeared related to Options Rider[3] including: documents pertaining to websites, trading accounts, statements, or practices of the entities at issue; documents concerning Mr. Conley's communications with individuals associated with the entities at issue, such as Bob Roberts, Michael Sloan, and/or others, as well as communications with customers and potential customers

---

[3] The Division discerned that these other companies appeared to be related to Options Rider as: (1) the other companies' websites appeared substantively identical to Options Rider's website, (2) Options Rider's website and the other companies' websites utilized the same proxy registrant to register the websites, and (3) Options Rider and the companies appeared to be perpetrating similar pooling and managed account investments in binary options without being registered with the Commission. *Id.* at ¶ 14, n. 1. Indeed, at one time, a website identified as *www.preferredbinaryoptions.com* had links to the websites of several binary options investment programs including Options Rider's website as well as the other companies' websites. *Id.*

6

of the entities at issue; and documents concerning Mr. Conley's own investments and account relating to the entities at issue. *Id.* at ¶ 14 and Ex. A at p. 9–11 thereto.

The Subpoena established March 7, 2016, as the return date for Mr. Conley's production of responsive documents and for his appearance at the Commission's headquarters in Washington, D.C.[4] *Id.* at ¶ 15. A warning that "failure to comply with this subpoena may result in the commencement of a legal action in the United States District Court to compel compliance with the requirements hereof" appeared in bold face, capital letters type on the front of the Subpoena. *Id.*

Subsequently, on February 29, 2016, Mr. Conley spoke by phone with the Division, acknowledged service of the Subpoena, and expressed a willingness to comply with the Subpoena, explaining that he would begin gathering responsive documents. *Id.* at ¶ 16. As a courtesy, the Division granted an extension of time for Mr. Conley to comply with the Subpoena and provide the required documents until March 25, 2016. *Id.*

On March 15, 2016, however, the Division received from Mr. Conley a copy of the Subpoena, notarized on March 1, 2016, with a notation reading "I do not accept this offer to contract and I do not consent to these proceedings." *Id.* at ¶ 17 and Ex. B at p. 2 thereto. Below this notation was Mr. Conley's signature with the further notation "without prejudice, UCC 1-

---

[4] The Subpoena also stated that Mr. Conley would be excused from appearing personally for testimony in D.C. at that time so long as he produced the documents demanded by the Subpoena on or before the close of business on March 4, 2016. Attorney Decl. at ¶ 15 and Ex. A at p. 1 thereto.

7

308."[5] *Id.* In response to this, on March 21, 2016, the Division reached out to Mr. Conley with a voicemail and by email seeking to reach a resolution on his compliance with the Subpoena without the necessity of a federal court's intervention. *Id.* at ¶ 18. Indeed, the email made clear that failing to respond and reach a resolution would lead the Division to commence a subpoena enforcement action in federal court that could result in unnecessary costs to Mr. Conley associated with defending the action. *Id.* and Ex. C thereto. Mr. Conley did not return the voicemail, respond to the email, or otherwise resume contact with the Division. *Id.*

Indeed, in a final attempt to obtain Mr. Conley's compliance with the Subpoena without the necessity of a federal court, on June 30, 2016, the Division sent Mr. Conley by UPS and e-mail, a draft of this Memorandum in Support of Application. *Id.* at ¶ 19 and Ex. D thereto. In particular, the Division pointed out to Mr. Conley that several facts demonstrated that he clearly possessed relevant information pertaining to at least Options Rider and that his notation to the Subpoena and especially to Section 1-308 of the Uniform Commercial Code did not relieve him of his obligation to respond to the Subpoena. The Division further informed Mr. Conley that unless he complied with the Subpoena, the Division would seek authority from the Commission to file an action against him seeking to enforce the Subpoena with this Court. As before, Mr.

---

[5] Apparently Mr. Conley added these notations under the mistaken belief that the Subpoena was an offer to contract and, as such, subject to the Uniform Commercial Code and its provisions. Mr. Conley's belief is wrong. A subpoena, like the Subpoena here, is not an offer to contract but rather is a ***command*** to appear at a certain time and place to produce books, papers and other tangible things (*duces tecum*) or to give testimony (*ad testificandum*) in a matter. *See* Subpoena, *Black's Law Dictionary* (10th ed. 2014). The authority of the Commission to issue that command to Mr. Conley for the information sought by the Subpoena comes from the authority that Congress granted the Commission in the Act. 7 U.S.C. 9(5) (2012) ("[F]or the purpose of any investigation or proceeding under this chapter . . . any . . . officer designated by the Commission . . . may administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, or other records that the Commission deems relevant or material to the inquiry.")

Conley did not respond or otherwise resume contact with the Division after this final communication. *Id.*

The deadline set for document production expired on March 25, 2016 with no production or further communication from Mr. Conley. Attorney Decl. at ¶ 20. To date, the Division has not received any documents from Mr. Conley, has not taken any testimony from Mr. Conley and has not had any further communications from Mr. Conley since his refusal to comply with the Subpoena as notarized on March 1, 2016. *Id.*

## JURISDICTION AND VENUE

The Act provides that

> In the case of contumacy by, or refusal to obey a subpoena issued to, any person, the Commission may invoke the aid of any court of the United States within the jurisdiction in which the investigation or proceeding is conducted, or where such person resides or transacts business, in requiring the attendance and testimony of witnesses and the production of books, papers, correspondence, memoranda, and other records.

7 U.S.C. § 9(8) (2012). The Commission's Washington, D.C. headquarters office is the hub of the nationwide investigation into Options Rider and commodity pool and/or managed account fraud that resulted in the Subpoena issued to Mr. Conley; the Division staff conducting the investigation are located in Washington, D.C.; and the Division issued the Subpoena from, and the Subpoena was returnable to, Washington, D.C. Attorney Decl. at ¶¶ 4–7 and 12–13. For these reasons, this Court has jurisdiction over Mr. Conley with respect to this action, and venue properly lies with this Court. *Id.*; *see also Nat'l Labor Relations Bd. v. Cooper Tire & Rubber Co.*, 438 F.3d 1198, 1204 (D.C. Cir. 2006); *U.S. Int'l Trade Comm. n v. ASAT, Inc.*, 411 F.3d 245, 249 (D.C. Cir. 2005); *CFTC v. Sullivan,* No. 15-mc-00032 (RDM), *Memorandum and Order* at 3-4 (D.D.C. April 3, 2015), a copy of which is attached here at Ex. 3 (holding that venue and jurisdiction were proper within Washington, D.C. because the Commission had

9

demonstrated that it was conducting an essentially nationwide investigation from its national office in Washington, D.C.; accordingly, the Commission was afforded broad discretion in selecting that jurisdiction as its place of origin and its decision to seek enforcement of the subpoena in that district did not exceed the bounds of reasonableness).

## ARGUMENT

Administrative agencies like the Commission "wield broad power to gather information through the issuance of subpoenas," *Resolution Trust Corp. v. Grant Thornton*, 41 F.3d 1539, 1544 (D.C. Cir. 1994), and "[a]n administrative subpoena must be enforced if the information sought 'is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.'" *Resolution Trust Corp. v. Walde*, 18 F.3d 943, 946 (D.C. Cir. 1994) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)); *accord Resolution Trust Corp. v. Frates*, 61 F.3d 962, 964 (D.C. Cir. 1995); *CFTC v. Ekasala*, 62 F. Supp. 3d 88, 93 (D.D.C. 2014); *United States v. Capitol Supply, Inc.*, 27 F. Supp. 3d 91, 99 (D.D.C. 2014). Here, the Commission's investigation is within its jurisdiction, and its administrative process and the Subpoena complies with this Circuit's standard for enforcement.

**I.    The Subpoena is Within the Commission's Broad Investigative Authority**

The Commission, like other federal agencies, has far-reaching investigatory authority permitting it to "investigate merely on suspicion that the law is being violated, or even just because [the agency] wants assurance that it is not." *Morton Salt*, 338 U.S. at 642–43; *see also Walde*, 18 F.3d at 947 (following *Morton Salt*). The Commission's authority is especially broad at the pre-complaint stage, where it "is under no obligation to propound a narrowly focused theory of a possible future case." *Ekasala*, 62 F. Supp. 3d at 93 (quoting *Federal Trade Comm. v. Texaco*, 555 F.2d 862, 872 (D.C. Cir. 1977)).

An essential component of this investigatory power is the Commission's ability to issue and serve subpoenas. *See* 7 U.S.C. § 12(a)(1) ("For the efficient execution of the provisions of this Act . . . the Commission may make such investigations as it deems necessary to ascertain the facts regarding the operations . . . [of] persons subject to the provisions of this Act.") *and* 7 U.S.C. § 9(5) ("[A]ny . . . officer designated by the Commission . . . may . . . subpoena witnesses, compel their attendance, take evidence, and require the production of any . . . records that the Commission deems relevant or material to the inquiry"); *see also CFTC v. Harker*, 615 F. Supp. 420, 424 (D.D.C. 1985) ("[T]he Act grants the Commission the authority to subpoena witnesses and to seek judicial enforcement of such subpoenas." (citing 7 U.S.C. § [9])).

Having followed proper administrative procedure, "[t]he CFTC must be given substantial leeway to investigate" so that it may assess whether parties have "complied with or run afoul of the [Act] or CFTC Regulations," *Collins v. CFTC*, 737 F. Supp. 1467, 1485 (N.D. Ill. 1990), and "enforcement of [its] investigatory subpoena will be denied only when there is 'a patent lack of jurisdiction' in an agency to regulate or to investigate." *Federal Trade Comm. v. Ken Roberts Co.*, 276 F.3d 583, 587 (D.C. Cir. 2001), *cert. denied*, 537 U.S. 820 (2002) (*quoting Civil Aeronautics Bd. v. Deutsche Lufthansa Aktiengesellschaft*, 591 F.2d 951, 952 (D.C. Cir. 1979)); *see also Texaco*, 555 F.2d at 872 ("[T]he scope of issues which may be litigated in an enforcement proceeding must be narrow, because of the important government interest in the expeditions investigation of possible unlawful activity."); *Capitol Supply*, 27 F. Supp. 3d at 99 (citing *Texaco*).

The Subpoena to Mr. Conley—properly issued pursuant to a formal order of investigation—plainly falls within the scope of the Commission's authority to investigate potential violations of the Act and Regulations. *See* 7 U.S.C. §§ 9, 12(a)(1) (2012). The

11

Subpoena seeks documents and information relating to a potential fraudulent scheme involving a pooled or managed investment vehicle that solicits for the purported purpose of trading commodity option products, namely the management of accounts trading binary commodity options in forex on behalf of customers located in the United States and elsewhere. This type of conduct falls squarely within the Commission's regulatory authority. *See, e.g.*, 7 U.S.C. § 6b (2012); 17 C.F.R. § 180.1 (2016); *see also CFTC v. Trade Exchange Network Ltd.*, 117 F.Supp.3d 29, 35–38 (D.D.C. 2015) (holding that binary options in commodities such as forex are financial instruments regulated by the Commission under the Act); *CFTC v. Vision Financial Partners, et al.*, Case No 16-60297-Civ-Cohn/Seltzer, Dkt. No. 62, *Order Denying Motion to Dismiss* at 6–7 (S.D. Fla. June 3, 2016), attached here at Ex. 2. Documents and testimony responsive to the Subpoena would assist the Commission with determining whether there are or have been violations of these provisions.

## II. The Subpoena Seeks Specific, Relevant Information

The standard for determining the relevance of records and testimony requested by an administrative subpoena "'is more relaxed than in an adjudicatory one . . . . The requested material, therefore, need only be relevant to the *investigation*—the boundary of which may be defined quite generally . . . .'" *Walde*, 18 F.3d at 947 (*quoting Federal Trade Comm. v. Invention Submission Corp.*, 965 F.2d 1086, 1090 (D.C. Cir. 1992), *cert. denied*, 507 U.S. 910 (1993)); *accord Ekasala*, 62 F. Supp. 3d at 93. In making a relevancy determination, a court must accept a federal "agency's own appraisal of relevancy . . . so long as it is not 'obviously wrong.'" *Invention Submission*, 965 F.2d at 1089 (quoting *Federal Trade Comm. v. Carter*, 636 F.2d 781, 787–88 (D.C. Cir. 1980)); *accord Ekasala*, 62 F. Supp. 3d at 93. In the event of a challenge to a subpoena, "the party resisting an administrative subpoena bears the burden of showing that the information sought is irrelevant." *Frates*, 61 F.3d at 964.

Here, Mr. Conley has provided no basis for his refusal to comply with the Subpoena. Further, he has not contested that he has no relevant documents or information. Instead, he simply has written: "I do not accept this offer to contract and I do not consent to these proceedings," and otherwise has refused to further communicate with the Division. Attorney Decl. at ¶¶ 17–20. In any event, a belated claim of irrelevancy would certainly fail. The Subpoena seeks information that is clearly relevant to the Commission's investigation into potential fraud in pooled or managed commodity accounts by Options Rider and/or other companies and, given the numerous audio recordings of Mr. Conley's conference calls with customers and potential customers of Options Rider, it is clear that Mr. Conley has information in his possession, custody and control related to Options Rider. Thus, for example, documents concerning the entities' trading accounts, statements, or practices, Attorney Decl. at ¶ 14 and Ex. A thereto at 9–11 (Requests 2–5), will allow the Commission to assess the scope and nature of relevant trading involved. Documents concerning Mr. Conley's communications with individuals associated with the entities, such as Bob Roberts, Michael Sloan, and/or others, as well as communications with potential customers, *id.* (Requests 7–10), will provide leads as to who else is involved with the entities. Documents concerning Mr. Conley's own investments and account relating to the entities, *id.* (Requests 6 and 14–15), will shed light on the nature and extent of Mr. Conley's own involvement with Options Rider and/or the other companies. Further, testimony from Mr. Conley on these and other related topics will be instrumental to the Commission's understanding of the nature, scope, and extent of the relevant activities, and to further aid in its investigation. Measured, as they must be, "'only against the general purposes of [the] investigation,'" such requests and demand for testimony indisputably are "reasonably" relevant to the Commission's investigation. *Ekasala*, 62 F. Supp. 3d at 93 (quoting *Texaco*, 555

13

F.2d at 874) (finding requests for "corporate formation documents, promotional materials, information regarding former officers and employees, and bank account statements" to "plausibly contain information relevant to the investigation").

Finally, the Subpoena is narrowly focused, limited in time, and imposes minimal burdens on Mr. Conley. The Subpoena provides dates, definitions, instructions and nineteen specific requests for documents, limited to the period of January 1, 2013 through the present. Attorney Decl. at ¶ 14 and Ex. A thereto. Such requests are reasonable and should be enforced. *See Ekasala*, 62 F. Supp. 3d at 93 (enforcing a subpoena with similarly definite requests); *see also Texaco*, 555 F.2d at 882 ("We emphasize that the question is whether the demand is unduly burdensome or unreasonably broad. Some burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest."). To the extent Mr. Conley attempts for the first time in response to this application to argue burden, this Court should deny such argument on the grounds that he "has not been responsive or particularly communicative with the CFTC regarding compliance . . . [and] he never made an attempt to comply with them in the first instance." *See Ekasala*, 62 F. Supp. 3d at 95.

## CONCLUSION

The Subpoena, and the documents and information, it seeks are well within the Commission's authority, and they are sufficiently definite and seek reasonably relevant information. The Court should therefore issue an order requiring Mr. Conley to show cause why he should not be compelled to comply fully with the Subpoena, and, if necessary, an order (1) requiring Mr. Conley to comply immediately in all respects with the Subpoena, including (a) that he produce all books, papers, documents and other tangible things specified in Schedule A to the Subpoena to the Commission that are in his possession, custody and/or control, and (b) that he personally appear before the Commission at its office in Washington, D.C., to provide

14

testimony, as well as (2) any other relief the Court deems appropriate for Mr. Conley's failure to show good cause.

Dated: October 17, 2016

Respectfully submitted,

_____
James Deacon (DC Bar No. 476216)
*jdeacon@cftc.gov*
U.S. COMMODITY FUTURES TRADING COMMISSION
Three Lafayette Centre
1155 21st Street NW
Washington, D.C. 20581
Tel: (202) 418-5526

15